**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Kurt VREEKEN and Fred R. Vreeken, Defendants-Appellants.**

Nos. 84–2745, 84–2750.

United States Court of Appeals, Tenth Circuit.

Oct. 21, 1986.

Before BARRETT and LOGAN, Circuit Judges, and THOMPSON, District Judge.*

LOGAN, Circuit Judge.

Defendants Fred R. Vreeken and Kurt Vreeken appeal their convictions for aiding in the preparation of false income tax returns in violation of 26 U.S.C. § 7206(2), and willful failure to report income in violation of 26 U.S.C. §§ 7206(1) and 7203. Kurt Vreeken contends that the "rule of speciality" contained in the United States-Canada extradition treaty bars his prosecution on the tax offenses charged. Both Vreekens make the following arguments on appeal: (1) the trial court erred in excluding evidence of lack of intent; (2) the relevant tax law was so unsettled that intent, as a matter of law, could not be proven; (3) the court improperly excluded testimony of expert witnesses; (4) the court erred in instructing the jury on intent; and (5) derogatory comments by the trial judge prejudiced their right to a fair trial. Fred Vreeken also challenges the court's allowing the prosecution to cross-examine him beyond the scope of his direct testimony.

From 1977 to 1980 Fred Vreeken and his son, Kurt Vreeken, designed, operated, and sold tax shelters. The shelters promised investors a four-to-one tax write-off. The Vreekens represented that investors would contribute a specified amount of money, 1X dollars, into the shelter and a foreign entity would contribute three times this amount, 3X dollars, as a gift to the investor (under the plan marketed in 1977), or as the purchase price of an option on the investor's rights (under the plans marketed in 1978–80). The 4X dollars (1X + 3X) would then be used for research and development pursuant to I.R.C. § 174, for which the taxpayer/investor would be entitled to claim a deduction for federal income tax purposes for the entire 4X amount.

Kathleen M. Adams and James W. McConkie of Parker, McKeown & McConkie, Salt Lake City, Utah, for defendants-appellants.

Stewart C. Walz, Asst. U.S. Atty. (Brent D. Ward, U.S. Atty., and Tena Campbell, Asst. U.S. Atty., with him on briefs), Salt Lake City, Utah, for plaintiff-appellee.

* The Honorable Ralph G. Thompson, United States District Judge for the Western District of Oklahoma, sitting by designation.

On April 11, 1984, the Vreekens were indicted on thirty-six counts each of aiding and abetting in the preparation of false and fraudulent income tax returns in violation of 26 U.S.C. § 7206(2). In addition, Fred Vreeken was indicted on two counts of willfully signing and subscribing false income tax returns in violation of 26 U.S.C. § 7206(1), and Kurt Vreeken was indicted on three counts of willful failure to file income tax returns in violation of 26 U.S.C. § 7203. After a three-week trial, the Vreekens were convicted on all counts.

I

Kurt Vreeken asserts that the "rule of speciality" contained in a Treaty on Extradition, Dec. 3, 1971, United States-Canada, 27 U.S.T. 983, T.I.A.S. No. 8237, protects him from this tax prosecution. Article 12(a) of the treaty states that rule as follows: "A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted...."

On October 27, 1983, Kurt Vreeken was arrested in Toronto, Canada, pursuant to an extradition request by the United States government. The indictment on which the request was based charged Vreeken with several counts of wire fraud. On November 2, 1983, Vreeken signed a "Waiver and Consent," and was delivered on court order to a United States Marshal in Toronto. After his return to the United States and while released on bail for the wire fraud charges, Vreeken was indicted on the charges now before us.

Kurt Vreeken's rule of speciality claim raises several issues, including whether the treaty applies when formal extradition proceedings were never completed, whether he waived the rule's protection by signing the "Waiver and Consent" and, if so, whether the waiver was "knowing." *See United States v. Vreeken,* 603 F.Supp. 715 (D. Utah 1984). We need not reach these issues, however, as we agree with the trial court that Kurt Vreeken failed to raise the objection in a timely manner. *Id.* at 723–

24. The Federal Rules of Criminal Procedure require a defendant to make all "objections based on defects in the institution of the prosecution" by the deadline set by the court for making pretrial motions. Fed.R.Crim.P. 12(b)(1), (c), (f). Failure to make a timely objection constitutes waiver of the objection. *Id.* 12(f). Although, under Rule 12(b)(2), objections challenging the court's jurisdiction may be made at any time, the term "jurisdiction" as used there refers solely to subject matter jurisdiction, not to personal jurisdiction. *Sewell v. United States,* 406 F.2d 1289, 1292 (8th Cir.1969); *Pon v. United States,* 168 F.2d 373, 374 (1st Cir.1948); *see also* 8 R. Cipes, *Moore's Federal Practice* ¶ 12.03[1] at 12–19 (1986).

The speciality rule may initially appear to limit the courts' subject matter jurisdiction, because it bars trial of an extradited defendant on some charges, but not on others. But the extradition process is one whereby a court gains personal jurisdiction over a defendant, *see* 2 D. O'Connell, *International Law* 792–806 (1965) (Ch. 23, "Personal Jurisdiction: Extradition and Asylum"). Insofar as a defendant has a right to claim the rule's protection, it functions to limit the court's personal jurisdiction over the defendant.

This point is emphasized in the very case that gave extradited defendants a right to claim the rule's protection, *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886). There, in applying the rule of speciality, the Court concluded: "[W]hile the court did have jurisdiction to find the indictment, as well as of the questions involved in such indictment, *it did not have jurisdiction of the person at that time, so as to subject him to trial." Id.* at 432, 7 S.Ct. at 247, 30 L.Ed. at 433–34 (emphasis added). *Rauscher* explicitly contemplated the possibility of gaining personal jurisdiction in the future: "[A]t some future time, when the defendant may have been properly brought within the jurisdiction of the court, or rightfully found within such jurisdiction, he may then be tried...." 119 U.S. at 432, 7 S.Ct. at 247,

30 L.Ed. at 433. *See also United States v. Najohn,* 785 F.2d 1420, 1422 (9th Cir.1986) (analyzing rule's effect on personal jurisdiction).

The ability of a defendant to waive the rule of speciality's protection also supports treating it as a limit on personal jurisdiction. By declining an opportunity to leave the country, an extradited defendant effectively can consent to a court's jurisdiction to try him on charges other than those stated in the extradition request. Although parties can consent to personal jurisdiction, it is well settled that they cannot consent to subject matter jurisdiction. *California v. LaRue,* 409 U.S. 109, 112 n. 3, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *see also* 1 J. Moore, *Moore's Federal Practice* ¶ 0.60[4] at 624 (1986). Indeed, the courts must raise a lack of subject matter jurisdiction even if the parties have not. This does not appear to be the kind of issue we should hold cannot be waived. If a defendant could waive the issue knowingly he should be able to waive it by procedural default—in this case, failure to follow the rules of the local forum. *See Smith v. Murray,* — U.S. —, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Murray v. Carrier,* — U.S. —, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Thus, in the circumstances of this case, we hold that Kurt Vreeken had to timely raise an objection based on the rule of speciality in a pretrial motion.[1]

The trial court here originally set May 25, 1984, as the deadline for submission of pretrial motions pursuant to Fed.R.Crim.P. 12(c), and later extended the deadline to August 15, 1984. Kurt Vreeken, however, did not allege the rule of speciality as a bar to his prosecution on the tax offenses until September 26, 1984, more than a month after the extended deadline. While "for cause shown" the trial court may grant relief for this error, Fed.R.Crim.P. 12(f),

the court here denied further relief. 603 F.Supp. at 724. Thus, by procedural default, Kurt Vreeken waived his right to assert the rule's protection. *Stevenson v. United States,* 381 F.2d 142, 144 (9th Cir. 1967) (motion on day of trial not timely); *cf. United States v. Cadena,* 585 F.2d 1252, 1260 (5th Cir.1978) (objection before pretrial motion cutoff was timely).

## II

The Vreekens assert that the court excluded evidence proffered to demonstrate lack of intent. Specifically, the Vreekens claim that (1) Kurt Vreeken was denied an opportunity to explain why he structured the tax shelters as he did; (2) evidence regarding Kurt Vreeken's 1979–81 income was excluded; (3) investors in the tax shelter could not be adequately cross-examined; and (4) the Vreekens were denied the use of a blackboard.

## A

The Vreekens assert that the court denied Kurt Vreeken the opportunity to show the jury that he acted without criminal intent, by hindering his ability to explain his reasoning and mental processes in structuring the tax shelter.

This court has held that in the context of tax prosecutions that "the accused as part of his defense is entitled to wide latitude in the introduction of evidence which tends to show lack of specific intent." *United States v. Brown,* 411 F.2d 1134, 1137 (10th Cir.1969). We agree that the trial court too strictly limited some of Kurt Vreeken's testimony. The court several times limited Kurt Vreeken's testimony to descriptions of physical acts: "I think we ought to have him simply tell us what he did.... What did you do? What did you do?" R. VIII, 1382; "I think you're

---

1. Although the rule of speciality is primarily designed to protect the "dignity and interests" of the asylum state, *Shapiro v. Ferrandina,* 478 F.2d 894, 906 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *see Rauscher,* 119 U.S. at 422, 7 S.Ct. at 242, 30 L.Ed. at 430, our holding today does not threat-

en these values. Canada's interests in United States citizen Kurt Vreeken's prosecution for tax crimes against the United States are not great in the first place, and are attenuated because Vreeken was returned before any evidentiary hearings or a finding of extraditability was made by a Canadian official or court.

really interested in putting fact questions." R. IX, 1769; *see also* R. VIII, 1341, 1345. Moreover, the judge stated, "We're interested in what he did." R. IX, 1767; *see also* R. IX, 1571. The jury might have construed these latter comments as instructions to disregard issues of intent. The Vreekens' attorney summed up his clients' frustration when he told the judge: "But [the jurors] never get to see what he's thinking. It's like A shoots B. He comes over, he thinks the gun is unloaded, so in trial the judge says to him you can only tell what you did." R. IX, 1638–39.

■ Although the judge's comments were error, we find the error harmless. Under the Supreme Court's recent decision in *United States v. Lane,* — U.S. —, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), we can reverse only upon a finding that the error "affects substantial rights" and "results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* — U.S. at —, 106 S.Ct. at 731 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). The harm attributable to the error in question is limited by several factors. Kurt Vreeken was allowed to testify for three days on direct and had at least two lengthy opportunities to present testimony bearing on his thought processes. Moreover, the government introduced substantial evidence tending to show intent. The Vreekens' tax shelter was not only blatantly fraudulent, *see* R. X, 1852–59 (describing fictitious bank loans), but the Vreekens also took great pains to conceal their activities from the Internal Revenue Service. Given that Kurt Vreeken had substantial opportunity to testify with regard to his intent and that the evidence of guilty intent was overwhelming, we hold that the error was harmless.

**B**

Kurt Vreeken claims that the testimony of his tax attorney and the evidence of his 1982 tax return were relevant to his failure to file tax returns in 1979, 1980, and 1981.

Kurt Vreeken admitted that he had received funds during these years, but asserted that "he believed these funds were not taxable at the time he received them because the funds were for the purchase of an option agreement." Appellant's Brief at 35.

■ The tax attorney, Gary Joslin, was to testify that in 1982 or 1983 he had advised Kurt Vreeken that the option money was not taxable. Joslin's advice in 1982 or 1983, however, could in no way be relevant to establishing Kurt Vreeken's state of mind at the time he failed to file tax returns in 1979, 1980, and 1981. Thus, excluding the tax attorney's testimony was proper. Kurt Vreeken's decision to report these moneys in his 1982 tax return was relevant to his intent in failing to file tax returns in the three earlier years, because Vreeken asserted his belief that such funds were only taxable when the options lapsed in 1982. However, without more, we cannot find that the trial court's exclusion of the 1982 return was an abuse of discretion.

**C**

■ The Vreekens complain that the court improperly limited their cross-examination of investors. The court, however, properly excluded as irrelevant questions concerning the income of tax shelter investors and the reasons for their participation. The Vreekens never asserted a basis on which the other questions that were disallowed might have been relevant. Moreover, the Vreekens overstate the degree to which they were hampered in questioning the bias of witnesses. The court, for example, allowed questions whether IRS agents had coerced or influenced testimony.

**D**

■ Finally, the Vreekens complain that the court denied them the use of a blackboard. Because blackboards can be easily erased, their use limits the quality of a record for later jury inspection and appellate review. This denial was well within the discretion of the court to control the

trial process. *See Geders v. United States,* 425 U.S. 80, 86–87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976).

### III

The Vreekens claim that the reasoning in *United States v. Dahlstrom,* 713 F.2d 1423 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984), should immunize them from prosecution as a matter of law. In *Dahlstrom,* the Ninth Circuit reversed the convictions of defendants who had organized a foreign trust tax shelter scheme, because "when the law ... is highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." *Id.* at 1428 (quoting *United States v. Critzer,* 498 F.2d 1160, 1162 (4th Cir.1974)).

■ The Vreekens, however, misconstrue the government's theory of the case. In its opening argument the government conceded that the legality of the tax shelter "if operated as advertised and as represented by the Vreekens" was not in question. R. IV, 10. Instead, the government argues that the Vreekens misrepresented to investors material elements of the tax shelter. The investors "were supplied false information, ... the money that was represented to exist did not exist, ... the banks that were represented to exist did not exist, and ... the money that was supposed to be spent on deductible items was not so spent." Brief of Plaintiff-Appellee at 16.

The Vreekens' fraudulent misrepresentations constituted the illegality at issue in this case. The evidence of these misrepresentations was overwhelming, clearly sufficient to send the issue of intent to the jury.[2]

### IV

The Vreekens argue that exclusion of the testimony of tax and banking experts was improper. But the government's straightforward theory of the case, *see* III *supra,* also informs the trial court's decision to exclude expert testimony.

■ We note initially that "the admission of expert testimony is within the sound discretion of the trial court, and its rulings will not be disturbed absent a clear abuse of discretion." *United States v. Barton,* 731 F.2d 669, 672 (10th Cir.1984). As a general rule, questions of law are the subject of the court's instructions and not the subject of expert testimony. *United States v. Ingredient Technology Corp.,* 698 F.2d 88, 97 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); *see also United States v. Jensen,* 608 F.2d 1349, 1356 (10th Cir.1979) ("an expert witness cannot state legal conclusions by applying law to the facts").

■ We agree with the Vreekens that when an area of law is uncertain or unresolved, the testimony of an expert may be relevant to show whether the defendant acted "willfully." *See United States v. Garber,* 607 F.2d 92, 98–99 (5th Cir.1979); *United States v. Clardy,* 612 F.2d 1139, 1153 (9th Cir.1980); *but see Ingredient Technology Corp.,* 698 F.2d at 97 (criticizing *Garber*). But such is not the case at bar. The Vreekens were accused of not operating the tax shelter as advertised, of misrepresenting to investors material elements of the tax shelter. The law regarding this kind of fraud and misrepresentation is well settled, and therefore expert opinion regarding the complexity of the tax law could be properly excluded.

The government's straightforward legal theory similarly undermined the Vreekens' case for expert banking testimony. Moreover, the trial court could properly determine under Fed.R.Evid. 403 that the probity of such testimony was substantially outweighed by the danger of confusion or undue delay. *Cf. Hill v. Bache Halsey*

---

2. The Vreekens' contention that the uncertain legality of such tax shelters denied the Vreekens fair and adequate notice to support a criminal conviction, *see United States v. Batchelder,* 442

U.S. 114, 123, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979), is also without merit. The Vreekens had notice that the fraudulent misrepresentations at issue in this case were illegal.

*Stuart Shields Inc.,* 790 F.2d 817, 826 (10th Cir.1986).

## V

■ The Vreekens also argue that a jury instruction unconstitutionally shifted the burden of proving intent from the prosecution to defendants. They rely on *Sandstrom v. Montana,* 442 U.S. 510, 513, 99 S.Ct. 2450, 2453, 61 L.Ed.2d 39 (1979) (invalidating the instruction, "the law presumes that a person intends the ordinary consequences of his voluntary acts"). Under *Sandstrom* the test for unconstitutionality is whether any "reasonable juror could have given the presumption conclusive or persuasion-shifting effect." *Id.* at 519. To carry out this test a court "cannot read the challenged instruction in isolation, but must consider the instruction as a whole in determining whether a reasonable juror would have understood the court to have shifted the burden of persuasion." *Wiley v. Rayl,* 767 F.2d 679, 681 (10th Cir.1985).

The instruction at issue, as given in its entirety, was:

> "Intent ordinarily may not be proved directly because there's no way of fathoming or scrutinizing the operations of the human mind, but you may infer a defendant's intent from the surrounding circumstances. You may consider any statement made and done or omitted by a defendant and all other facts and circumstances in evidence which indicate his state of mind. You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide what facts to find from the evidence in the case."

R. X, 2213.

This instruction did not amount to error under *Sandstrom.* The court did not speak of presumptions, but instead repeatedly suggested that the jury "may infer" or "may consider" certain evidence and emphasized that it was "entirely up to

[the jury] to decide." This difference is crucial. As this circuit has held: "To allow the jury to pursue a deductive process on a permissive basis is far different from advising the jury that the law *presumes* that a person intends the ordinary consequences of his voluntary acts." *United States v. Ogle,* 613 F.2d 233, 243 (10th Cir.1979) (emphasis in original), *cert. denied,* 449 U.S. 825, 101 S.Ct. 87, 66 L.Ed.2d 28 (1980). The instruction given in this case conforms to our standard as enunciated in *Ogle* and does not offend the Constitution.

■ Additionally, the Supreme Court has recently announced that *Sandstrom* -type instructions will be subject to harmless error analysis. *Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Thus, even if we were to assume that the instruction violated the *Sandstrom* rule, we must examine it to determine whether the error could have made a difference in the outcome of the case. Based upon our examination of the record as a whole, we are confident the giving of the instruction was "harmless beyond a reasonable doubt." —— U.S. ——, ——, 106 S.Ct. at 3105, 92 L.Ed.2d 460.

## VI

■ The Vreekens also contend that derogatory comments by the district court judge prejudiced their right to a fair trial. The Vreekens claim that the judge's comments left a clear impression on the jury that Kurt Vreeken was making up his testimony. We disagree. The judge's admonitions were merely against using hypotheticals. As such, they were well within the reasonable bounds within which a trial judge may act. *Cf. United States v. Shelton,* 736 F.2d 1397, 1404 (10th Cir.) (quoting *Cooper v. United States,* 403 F.2d 71, 73 (10th Cir.1968) (trial judge's comment to defense counsel that court did not intend to take time "to hold law school" not prejudicial)), *cert. denied,* 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). We need not

consider remarks made outside the presence of the jury, since these could not have prejudiced the jury. *United States v. Buchanan,* 787 F.2d 477, 486 (10th Cir.1986).

### VII

 Finally, Fred Vreeken claims that the court allowed prosecution cross-examination beyond the scope of his direct testimony in several instances, violating his Fifth Amendment privilege against self-incrimination. Examining each of these instances in turn, we find the trial court's rulings proper. The single question regarding a business associate, Eugene Esson, was appropriate because Fred Vreeken had himself volunteered their association. Cross-examination regarding the organization of a fictitious bank, Teschen, and payments that he received from Teschen, were relevant for purposes of impeachment, because Fred Vreeken admitted that he had testified at prior hearings that he did not know who had formed or controlled Teschen. Cross-examination regarding destruction of documents was also relevant to impeach defendants' prior testimony about newly discovered documents.

Fed.R.Evid. 611(b) permits the trial judge "in the exercise of discretion [to permit inquiry on cross-examination] into additional matters." The Supreme Court has held that "a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination." *McGautha v. California,* 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971). The cross-examination at issue here was sufficiently related to Fred Vreeken's testimony on direct to avoid reversible error. *See United States v. .Varoz,* 740 F.2d 772, 780 (10th Cir.1984). Such rulings are "peculiarly susceptible to trial court decision." *United States v. Gant,* 487 F.2d 30, 35 (10th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 293 (1974).

AFFIRMED.